**William J. Drury, Appellee, v. Stephen E. Hurley et al., Civil Service Commissioners of Chicago, Appellants.**

**Gen. No. 44,764.**

Opinion filed November 8, 1949. Released for publication November 23, 1949.

BENJAMIN S. ADAMOWSKI, Corporation Counsel, for appellants; L. LOUIS KARTON, Head of Appeals and Review Division, and SYDNEY R. DREBIN, Assistant Corporation Counsel, of counsel.

CLARENCE M. DUNAGAN and EMMET F. BYRNE, both of Chicago, for appellee.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

William J. Drury and Thomas E. Connelly filed separate petitions for writs of certiorari to review the action of the Civil Service Commission of the City of Chicago which had ordered them discharged from their positions as lieutenant and captain of police, respectively, in the classified service of the Department of Police in the City of Chicago, because of their

refusal to execute in writing immunity waivers when summoned and prior to testifying before the March 1947, grand jury concerning matters arising out of their investigation of the shooting of one James M. Ragen. In September 1946, the two officers had been assigned by the Commissioner of Police to investigate some 80 unsolved murders, including the shooting on June 24, 1946, of Ragen, which resulted in his death some time afterward. In due course they interviewed three witnesses from whom they obtained signed statements that they could identify the occupants of the moving truck from which Ragen had been shot. Partly on the strength of their testimony and that of the two petitioners, who also testified before the grand jury on March 17, 1947, without claiming immunity, three men were indicted for the murder. Later, two of the witnesses recanted their testimony and when again called before the grand jury on April 2, 1947, stated that they could identify no one implicated in the Ragen shooting. Petitioners were forthwith summoned and each in turn appeared before the grand jury. As matters developed they had reason to believe that they were suspected of having conspired to obtain an unfounded indictment of the Ragen murder suspects, through subornation of perjury, bribery and threats, and that their testimony might be sought in an inquiry as to their own conduct in an investigation of that crime. Accordingly, when asked to sign immunity waivers, they refused to do so, and were excused without questioning. They were thereupon promptly suspended by the Commissioner of Police who subsequently filed with the Civil Service Commission charges that they were guilty of conduct unbecoming an officer (1) in refusing to waive immunity, and (2) in unlawfully conspiring among themselves and others to procure an indictment of three persons for the murder of Ragen. Because of the similarity

36

of the charges and by stipulation of counsel, the cases against both police officers were jointly heard by the Civil Service Commission which found that the evidence before it was insufficient to sustain the charge of unlawful conspiracy relating to the procurement of the indictments, but held that refusal to sign the immunity waiver was in effect a refusal to testify unless immunity be granted them, and was therefore conduct unbecoming a police officer and cause for dismissal. The discharged officers instituted separate proceedings for writs of *certiorari* to review the action of the Civil Service Commission. The trial judge who heard the petitions entertained motions to quash the writs, and in a written opinion found that "the Commission acted very carefully and certainly exercised no prejudice against the plaintiffs herein in its conduct of said proceeding. . . . it gave ample opportunity to the plaintiffs to be heard in their own defense and in its finding and decision reflects what the record shows, a frank and honest statement of the facts favorable to each of the plaintiffs," but gave as his reasons for sustaining the officers' motions (1) that while they did refuse to sign an immunity waiver when called before the grand jury, they at no time refused to testify, and (2) that as a matter of law the refusal of the officers to waive their constitutional privilege in advance of testifying did not constitute cause for removal. Because the trial court held that the discharge of petitioners for failure to execute in writing an immunity waiver would deprive them of their constitutional rights, defendants perfected a direct appeal to the Supreme Court of Illinois, which held (*Drury v. Hurley* (1949), 402 Ill. 243) that "there is no constitutional question involved in this proceeding such as would give us jurisdiction," and accordingly transferred the cause to this court for determination.

37

The Civil Service Act (Ill. Rev. Stat. 1947, ch. 24½, par. 51, § 12 [Jones Ill. Stats. Ann. 23.052]) provides that a municipal civil service employee may not be removed "except for cause, upon written charges and after an opportunity to be heard in his own defense." No provision being made for review, courts in this State have held that common-law *certiorari* is proper (*Kammann v. City of Chicago* (1906), 222 Ill. 63; *People ex rel. Fosse v. Allman* (1946), 329 Ill. App. 296). Since *Doolittle v. Galena & C. U. R. Co.* (1853), 14 Ill. 381, almost without exception Illinois courts have held that review on *certiorari* should be confined to two questions: Did the administrative agency have jurisdiction? and, Did it proceed legally? Thus, in *Wilcox v. People ex rel. Lipe* (1878), 90 Ill. 186, the court held that "where the law has vested a *quasi* judicial power, even in subordinate administrative officers, the court will only inquire whether the officer has acted within the power, and will not attempt to substitute its own judgment or discretion for that of the officer, and will not supply any other conditions to the exercise of their discretionary power than such as the law has provided." Later, in *People ex rel. Maloney v. Lindblom* (1899), 182 Ill. 241, the court held that "On a return to a writ bringing the record before the court the only proper inquiry is whether the inferior tribunal had jurisdiction and proceeded legally,—*i.e.*, followed the form of proceedings legally applicable in such cases . . . ." Still later, in *People ex rel. Holland v. Finn* (1927), 247 Ill. App. 53, this court found that "The record returned pursuant to the writ established the jurisdictional fact pertaining to the person, the subject matter and the grounds for discharge and a proper legal procedure for the removal of petitioner under section 12 of the Civil Service Act . . . . The writ shows the charges and specifications filed as cause of the re-

moval, the summons, the proof of service, the appearance of the accused and the finding that he was guilty, in which findings are set out the facts which were actually found and which are substantially in the language of the charges and specifications, and that therefore he was guilty of conduct unbecoming a police officer or an employee of the police department and of immoral conduct, as alleged in the charges. This establishes jurisdiction of the commission and that there has been a proper legal proceeding for the removal of the petitioner.'' In *Kammann v. City of Chicago, supra,* which involved the removal of an employee in the classified civil service for cause after an investigation of written charges before the Civil Service Commission, the court pointed out that the applicable statute is silent as to what constitutes ''cause'' and held that ''Manifestly the right to determine that question is left with the civil service commission, and we have held that this statute does not require the commission to specify, in written rules, every case which shall be deemed cause for removal. *Joyce v. City of Chicago,* 216 Ill. 466.'' In *City of Chicago v. People ex rel. Gray* (1904), 210 Ill. 84, the court held that ''After a trial is held in the manner pointed out by the statute before the proper board and evidence is taken tending to show the guilt of the person charged, we are of the opinion that the action of the civil service commission, based on the finding of the board, is final and not reviewable by the courts, . . . . The statute does not contemplate a review of the action of the commission which results in the discharge of an officer or employee of the city after a lawful trial before the proper board, by any tribunal whatsoever.'' In *People ex rel. Miller v. City of Chicago* (1908), 234 Ill. 416, it was held that ''Under the decisions of this court we think the finding of the trial board, approved by the civil service commission, as shown by this record, can-

39

not be set aside by the courts. . . . The contention of appellee in this regard, if upheld, would practically amount to a review of the evidence by the courts in all investigations conducted by the civil service commission or under its direction. This is not the law. As was said in *City of Aurora v. Schoeberlein* [230 Ill. 496] (p. 504,) such a review by the courts 'would be the exercise of executive powers, which the separation of departments of the government precludes the court from exercising.' " The more recent case of *Hopkins v. Ames* (1931), 344 Ill. 527, is to the same effect.

However, in several cases the review has apparently been extended to include a consideration of whether or not there is evidence fairly tending to support the conclusion of the agency. Thus, in *Carroll v. Houston* (1930), 341 Ill. 531, it was held that the court may examine the proceedings to determine whether the inferior tribunal had jurisdiction, that the facts upon which the jurisdiction is founded must appear in the record which must also show that it acted upon the evidence; but if the inferior tribunal had jurisdiction to hear and determine the case and proceeded legally the court is powerless to review the order on the ground that the respondent had been wrongfully discharged from office. In *Cartan v. Gregory* (1946), 329 Ill. App. 307, the trial judge and the reviewing court evidently relied on the case of *Funkhouser v. Coffin* (1921), 301 Ill. 257, for their authority to examine the evidence introduced on the trial before the Civil Service Commission and to determine from the evidence whether there was cause for removal. In the *Funkhouser* case the return of the writ filed by the commission did not cite any facts showing that it had jurisdiction of the persons or of the subject matter, nor did it "disclose in any way any facts constituting a cause for the removal of appellee from his position as a member of the police force of Chicago, and it can-

not be told from an inspection of the record that any such facts existed, the only statement in the record being that the evidence was heard and appellee was found guilty as charged.'' In other words the findings and decision of the commission were barren of a recital of facts from which the court could determine that the tribunal had jurisdiction and authority to discharge the respondent. It therefore appears that neither the *Cartan, Funkhouser* nor *Carroll* case states any rule of law contrary to the general rule so long enunciated in this State. Moreover, the case at bar involves no disputed issues of facts and no objection to the procedure followed by the commission and as shown, the trial judge found that the officers received a fair and impartial trial. It is apparent that the complaints for writs of *certiorari* filed by petitioners showed everything that is required to sustain the conclusion of the Civil Service Commission, and when to these essential elements is added a finding and decision by the commission which sets forth the facts actually found upon which the commission based its findings of guilty, a record was presented which satisfied all the legal requirements. It follows, that since the statute does not define ''cause,'' the legislature, as apparently recognized by the courts, left its definition and application to the discretion of the commission which, under section 12 of the Civil Service Act, was thus empowered to determine, not merely what cause is sufficient to justify removal, but also whether or not the accused was guilty of the cause charged. Accordingly, we think the trial judge exceeded his authority in reviewing the commission's finding that a refusal to sign a waiver was ''cause'' for dismissal. Inasmuch as the commission was established to administer the personnel affairs of the city and is charged with the duty of holding hearings to determine whether there is adequate cause for re-

41

moval, courts should not reverse the commission's findings of "cause" unless the finding is so unrelated to the requirements of the service that it is unreasonable and, therefore, arbitrary.

The basic question is not the right of the police officers to exercise a constitutional privilege, but whether their refusal to sign an immunity waiver was a breach of their public trust which impaired the efficiency standards and morale of the police department of the City of Chicago and therefore constituted conduct unbecoming a police officer and was "cause" for removal under section 12 of the Civil Service Act. In reaching its conclusion the commission relied principally upon three decisions supporting the view that it is inconsistent with the duty of a police officer to exercise his constitutional privilege to refuse to testify in a criminal case or to waive immunity on the ground that it would tend to incriminate him. In *Christal v. Police Commission of San Francisco* (1939), 33 Cal. App. (2d) 564, 92 P. (2d) 416, the court upheld the dismissal of police officers who, in the exercise of their constitutional privilege against self-incrimination, had refused to testify before a grand jury investigating the San Francisco Police Department, and said: "Such officers are the guardians of the peace and security of the community, and the efficiency of our whole system, designed for the purpose of maintaining law and order, depends upon the extent to which such officers perform their duties and are faithful to the trust reposed in them. . . . It is for the performance of these duties that police officers are commissioned and paid by the community, and it is a violation of said duties for any police officer to refuse to disclose pertinent facts within his knowledge even though such disclosure may show, or tend to show, that he himself has engaged in criminal activities." The police officers in that case contended that a depart-

42

mental rule requiring them to testify without reservation before the grand jury was invalid, but the court held that even in the absence of such a rule their action in refusing to testify was conduct unbecoming a police officer.

*Scholl v. Bell* (1907), 125 Ky. 750, 102 S. W. 248, involved the validity of an election and charges of fraud and conspiracy in connection therewith. Certain police officers had refused to testify in the trial court, in the exercise of their constitutional privilege against self-incrimination. The reviewing court, in condemning their action, said: "Here were police officers being interrogated as to existence of crimes they were paid to prevent, if possible; if not, to expose and punish afterwards; and yet they one and all refused to answer 'under advice of counsel.' Suppose a secret murder had been committed, and the police on that beat, when asked about it, should say, 'I decline to answer for fear of incriminating myself.' This, under the rule invoked, would protect the witness from answering; but how long would it justify his retention on the roll of the police? What would be thought of those who left the public safety in his hands longer than it would require to discharge him?" In discussing the policy of the privilege, Dean Wigmore (Evidence, 3rd ed., 1940, vol. 8, sec. 2251) pointed out that it originated as a restriction on the inquisitorial powers of the ecclesiastical courts, and that its restriction of inquisitions and stimulation of the prosecution to a full and fair search for evidence procurable by their own exertions are its principal justifications in our legal system. Cautioning that the privilege works more directly to protect the guilty than it does the innocent, he warned that in preserving the privilege, the courts must not give it more than its due significance, nor should they confirm the insidious impression that crime in itself is worthy of protection. The

43

correct moral attitude toward the privilege was well illustrated, Dean Wigmore thought, in the *Scholl* case, which he characterized as "a courageous and clear-thinking opinion." There the court said that the constitutional privilege of immunity "is a rule of necessity, beyond which it should not be extended. Its use should not be considered as affording the witness a certificate of good character."

In *Souder v. City of Philadelphia* (1931), 305 Pa. 1, 156 Atl. 245, involving an analogous state of facts, the court said: "Souder was a captain of police, whose duty it was, not only to guard and protect the citizens of the municipality which had honored him with its confidence by appointing him to the high position of trust and civic responsibility which he filled and to run down and bring to justice malefactors within its limits, but also, as an officer in high command of its police, to preserve and enforce discipline among those over whom he had been placed in a position of authority. . . . He should have held himself above suspicion. Instead of so doing, when charges of the gravest nature were brought against him by the grand inquest of the county, he answered before them in a way not to establish his freedom from wrong by full explanation, but in a manner calculated to confirm his complicity in crime, and, when summoned by his superior on specific charges before the tribunal charged by the law with the duty of inquiring into them, he answered not at all. This in itself was conduct unbecoming an officer."

In addition to these three decisions we find in the commission's brief additional authorities involving police officers and other public officials. In the early case of *McAuliffe v. City of New Bedford* (1892), 155 Mass. 216, 29 N. E. 517, the plaintiff filed a petition for mandamus to be restored to the office of policeman in New Bedford, having previously been found guilty of

violating a rule of the police department that none of its members should be allowed to solicit money or any aid, on any pretense, for any political purpose whatever. Plaintiff contended that the rule was invalid as invading his right to express his political opinions, and that a breach of it was not a sufficient cause for removal under the statutes. Mr. Justice Holmes, then sitting on the Supreme Court of Massachusetts, epigrammatically observed that "The petitioner may have a constitutional right to talk politics, but he has no constitutional right to be a policeman," and continued: "There are few employments for hire in which the servant does not agree to suspend his constitutional rights of free speech as well as of idleness by the implied terms of his contract. The servant cannot complain, as he takes the employment on the terms which are offered him. On the same principle the city may impose any reasonable condition upon holding offices within its control."

In *Goldway v. Board of Higher Education* (1942), 37 N. Y. S. (2d) 34, the petitioner was employed as an assistant English teacher in a high school in the State of New York. In answer to a personal subpoena served upon him he appeared at a public hearing of the Joint Legislative Committee to investigate the educational system of the State of New York, but declined to sign an immunity waiver. Because of this refusal he was directed to leave the witness stand and was not sworn nor did he give any testimony, but was discharged for violating section 903 of the New York City Charter which provided for discharge of an employee of the city who should, after lawful notice of process, refuse to appear before any legislative committee or should refuse to waive immunity from prosecution. The petitioner contended that the statute was unconstitutional, but the court held otherwise, saying that "The Legislature did not purport to abrogate the

45

right; it undertook to exercise its discretion as to the wisdom of retaining in public service an employee who exercised the privilege when his official acts are under review. It cannot be said that it is so manifestly unreasonable as to be beyond its constitutional competency for the State to determine that it is not salutary for it to continue in its employ a person who obstructs an investigation into his public conduct by a refusal to waive immunity. Clearly it is a legislative prerogative—and not for the courts to review its wisdom—to say that it is proper that public officials should not be permitted to hold office and at the same time shield themselves by a claim of privilege in the course of an investigation of their official acts. The Charter provision does not preclude any City employee from refusing to testify or compel him to waive immunity; indeed, that privilege was accorded to and the right was exercised by this petitioner. It does not follow that upon such refusal, constitutionally he must be permitted to retain his office.'' Although the decision in the *McAuliffe* case was predicated on a departmental rule, and the *Goldway* case grew out of a violation of the city charter, it is significant that in the *Christal* case, where a departmental rule was also in effect, the court pertinently observed that ''such a violation of duty would constitute cause for dismissal even in the absence of any specific rule requiring such officers to give testimony before the grand jury, or of any specific rule relating to 'conduct unbecoming an officer.' That such conduct constituted 'conduct unbecoming an officer,' there can be no doubt.''

In *Canteline v. McClellan* (1940), 282 N. Y. 166, 25 N. E. (2d) 972, affirming 16 N. Y. S. (2d) 792, police officers sought a declaratory judgment as to their rights and duties in view of the threat of their police commissioner to suspend them and prefer charges against them. When ordered to appear before the

46

grand jury they had declined to sign a waiver of immunity against subsequent criminal prosecution with respect to their conduct in office prior to the effective date of the Constitution then in force which provided for discharge of public officers who refused to sign immunity waivers. The court held, against a vigorous contention to the contrary, that the amendment applied to prior conduct, and in further supporting its decision that the officers were subject to removal, cited with approval *Christal v. Police Commission of City of San Francisco, supra,* which, as the New York court noted, involved, not a refusal to sign an immunity waiver, but a refusal to testify, and after stating that a similar question had arisen in the *Christal* case under a city police department rule, quoted with approval from that opinion: " 'As we view the situation, when pertinent questions were propounded to appellants before the grand jury, the answers to which questions would tend to incriminate them, they were put to a choice which they voluntarily made. Duty required them to answer. Privilege permitted them to refuse to answer. They chose to exercise the privilege, but the exercise of such privilege was wholly inconsistent with their duty as police officers. They claim that they had a constitutional right to refuse to answer under the circumstances, but it is certain that they had no constitutional right to remain police officers in the face of their clear violation of the duty imposed upon them. *McAuliffe v. Mayor of New Bedford,* 155 Mass. 216, 29 N. E. 517.' "

In the hearing before the Civil Service Commission and here, petitioners relied on *In re Holland* (1941), 377 Ill. 346; and in fact the trial judge based his decision upon that case, which appears to be the only one in Illinois dealing with a somewhat similar situation. There respondent, a judge of the municipal court, had exercised his constitutional privilege from

self-incrimination and refused to sign an immunity waiver when called before the grand jury. The Chicago Bar Association brought disbarment proceedings and recommended that his license to practise law be suspended for two years because of his refusal. The Supreme Court declined to uphold the recommendation, although stating that it did "not commend respondent's judgment nor his course of conduct" in the matter. The court emphasized that respondent could be tried only *as a lawyer,* and noting the three police cases heretofore discussed, took occasion to point out that "In such cases it was recognized that the officer was especially charged with the duty to prevent crime and to disclose any evidence that would assist in the apprehension of criminals," and that the duty resting upon a lawyer to assist in the investigation of crime is one "with which he is generally though not specifically charged, *as is a policeman.*" (Italics ours.) The *Holland* case did not involve the conduct of a police officer who, by reason of his position was, as the Supreme Court viewed it, especially charged with the duty of disclosing evidence as to crime, and impliedly held that the duties of police officers clearly place them within the exception for which the court provided.

It is significant that there appears to be no reported case in any jurisdiction upholding the right of a policeman to refuse to sign an immunity waiver or to refuse to testify when called to do so in a criminal case. All the decisions heretofore cited are consonant with the principle that a police officer, by reason of his special status, duties and responsibility, may not invoke his constitutional privilege against self-incrimination in matters touching upon his occupation without being guilty of a breach of duty on his part by reason of such refusal.

48

The trial judge did not take issue with the holding in the cases to which we have above referred, but instead, after emphasizing that the officers at no time refused to testify before the grand jury, sought to distinguish the cases on the ground that the two officers refused only to sign immunity waivers; and counsel for petitioners in his brief and upon oral argument sought to make the same distinction. The cases upon which they rely do not deal with the precise question. *People v. Rockola* (1930), 339 Ill. 474; *People v. Gibbs* (1932), 349 Ill. 83; *People v. Meisenhelter* (1943), 317 Ill. App. 511; *In re Grae* (1940), 282 N. Y. 428, 26 N. E. (2d) 963. As pointed out by the commission, one compelled to testify against himself is immune from criminal prosecution as to the subject matter to which his testimony relates. Accordingly, a refusal to sign an immunity waiver amounts to a refusal in advance to relinquish the benefits of the constitutional privilege that a person is not to be compelled to give evidence against himself in a criminal case; and when a person called as a witness refuses either to testify or to sign an immunity waiver in advance of testimony, he relies in either instance upon the same constitutional privilege against self-incrimination. One who refuses to testify before a grand jury in this State seeks the protection of the Illinois constitution by withholding testimony which might incriminate him; and one who refuses to sign an immunity waiver in advance of testimony before such a jury seeks the protection of that provision by declining in advance to give up the immunity to criminal prosecution which will follow by virtue of that provision if he is compelled to testify against himself. In seeking to differentiate between refusal to testify and refusal to sign an immunity waiver, petitioners' counsel argue that ''A waiver of immunity in writing appears to be a document based upon no statute, rule of law or

49

constitutional provision, but a form which certain prosecutors have prepared wherein the witnesses waived their immunity. The form of the waiver is revocable. The signing of it by the witness is voluntary. Therefore it has no legal effect.'' *Boone v. People* (1894), 148 Ill. 440, is illuminating on this point. It was there held that the grand jury constitutes a part of the court and that witnesses sworn before that body are sworn in open court, although not necessarily in the presence of the judge. Defendant was taken from jail and examined as a witness before the grand jury, and it was held that this constituted ground for quashing the indictment. In reaching this conclusion the court emphasized the statutory provision that a defendant in any criminal case or proceeding shall only at his own request be deemed a competent witness. The case indicates that Illinois courts would quash all resulting indictments if the person proceeded against answered questions before a grand jury, and seems to justify the practice of the Cook county state's attorney's office of not taking a party proceeded against before the grand jury unless he first signs an immunity waiver. (Journal of Criminal Law and Criminology of Northwestern University, vol. 38, no. 6, March–April, 1948, p. 619, comments by Dale E. Sherrow.) Inasmuch as the petitioners refused to waive immunity in writing, it would have been a proceeding of doubtful validity, to say the least, to take them before the grand jury for examination.

In the light of what has been said we think the distinction between refusing to testify and the refusal to sign an immunity waiver before testifying before the grand jury is more imaginary than real, and as pointed out in the excellent analysis of the subject above referred to, ''Refusal to sign an immunity waiver can mean only one thing—the person refusing to sign is unwilling to expose all he knows about cer-

tain alleged criminal activities because the exposure will tend to incriminate him. That is the only ground upon which this constitutional privilege can be invoked. Refusal to sign the waiver would seem to be just as much a breach of duty as an actual refusal to testify."

We are impelled to state that we heartily approve the wholesome decision of the Civil Service Commission. The judgment of the superior court is reversed.

*Judgment reversed.*

SCANLAN, J., concur.

SULLIVAN, J., took no part.