Thomas Harrison, Appellee, v. Civil Service Commission of City of Chicago et al., Appellants.

Gen. No. 45,645.

Opinion filed June 24, 1952. Released for publication July 9, 1952.

JOHN J. MORTIMER, Corporation Counsel, of Chicago, for appellants; L. LOUIS KARTON, Head of Appeals and Review Division, and SYDNEY R. DREBIN, Assistant Corporation Counsel, both of Chicago, of counsel.

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, of Chicago, for appellee; HOWARD ELLIS, WALTER E. TINSLEY, CHARLES R. MORROW, and THOMAS F. SCULLY, all of Chicago, of counsel.

MR. JUSTICE TUOHY delivered the opinion of the court.

Thomas Harrison, plaintiff, a captain of police in the City of Chicago, was tried before the Civil Service Commission of the City of Chicago on charges of violating certain rules and regulations of the department of police of the City of Chicago. From an order dis-

charging him from the police department, plaintiff initiated proceedings under the Administrative Review Act (Ill. Rev. Stat. 1951, chap. 110, pars. 264–279) [Jones Ill. Stats. Ann. 104.094 (1)–104.094 (16)] to review the decision of the Civil Service Commission. The matter was heard in the superior court of Cook county upon the complaint of the plaintiff and the return of the defendants, the Civil Service Commission of the City of Chicago, and Stephen E. Hurley, President, and Albert W. Williams and Charles A. Lahey, members thereof. The court found the issues in favor of the plaintiff and ordered that the record of proceedings be quashed and that the finding and decision of the Civil Service Commission ordering the discharge and removal of the plaintiff be reversed and set aside. From this decision defendants appeal to this court.

Plaintiff was charged with a violation of rules and regulations of the department of police as follows:

"Rule 389, section 29. Receiving or accepting a reward or gift from a person for a service rendered, or pretended to be rendered, as a member of the department without the consent of the Commissioner of Police."

"Rule 378. Other business prohibited: A member of the department shall devote his whole time and attention to his duties. He is expressly prohibited from following any other calling or occupation, or being engaged in any other business."

"Rule 389, section 3. Conduct unbecoming a police officer or employee of the police department."

The particular acts alleged in the complaint to constitute a violation of the aforesaid rules are: (1) that in the year of 1935 plaintiff, who in that year was promoted from sergeant to lieutenant of police, obtained a loan of $10,000 from one William Skidmore, described as "notoriously known to be engaged in gam-

bling as a business or profession''; (2) that in the same year plaintiff obtained a loan of $2,500 from one John J. Lynch, described as ''notoriously known to be engaged in the City of Chicago, in the business of printing and circulating racing and other information to bookmakers and gamblers'' and ''notoriously known as'' or ''generally reputed to be'' a professional gambler; (3) that plaintiff acted as a shotgun guard for Nash Bros., a Chicago construction firm, during a period from 1923 to October 1935, and received $20 for each trip made with its payroll car; and (4) that plaintiff received or accepted a reward or a gift of $30,000 from Lynch in 1937 for service rendered or pretended to be rendered as a member of the department without the consent of the commissioner of police.

The majority of the Commission found: As to the Skidmore and Lynch loans, ''although not unusual in form,'' the loans ''have lent themselves to unfavorable inferences, but this Commission may not, in the absence of definite proof, predicate disciplinary action upon imaginary grounds. Accordingly, these loans must be given the benefit of the presumption that they were the business transactions which they purported to be.'' As to the service performed for Nash Bros. the Commission found that ''even though the Commission might deprecate the respondent's occasional employment as a shotgun guard, it seems hardly justifiable to make that employment first entered upon about 28 years ago, with the prior knowledge and consent of the then head of the Chicago Police Department, a basis for his present discharge therefrom.''

These charges, upon which the Commission refused to predicate disciplinary action, are not before us on this appeal.

As to the $30,000 payment to plaintiff from Lynch the Commission found in part: ''The conclusion from the respondent's own statements and testimony is

irresistible that the $30,000 payment by Lynch to him was made in recognition of the respondent's long, faithful and extensive service as Lynch's bodyguard, which service had the obvious and important purpose of protecting Lynch from another kidnapping or other harmful acts by his enemies or by any persons of evil intent. Service of this type coincides precisely with the function and duty of the respondent and all other Chicago policemen at all times to see to the safety of the people of this community. It was essentially a police duty which the respondent could and did, in all respects, most effectively perform as, while and because he was a member of the Chicago Police Department. Lynch was simply able to get from the respondent preferred and continuous attention and service of the sort ordinarily performed on occasion by police officers for any member of the community when the need therefor arises. The $30,000 payment was received and accepted by the respondent without disclosure thereof to the then Commissioner of Police and without his consent.'' It was thereupon ordered by the Commission that plaintiff be discharged and removed from his position as captain in the department of police and as a member of the department of police. Commissioner Lahey dissented from the finding and was of the opinion that the respondent should be restored to duty.

The basis for the charges brought against plaintiff was a report made by the plaintiff himself to the then commissioner of police, John C. Prendergast, dated October 18, 1950, in which plaintiff reported testimony given by him before a United States Senate Investigating Committee on organized crime. This report was read into the record on stipulation of the parties. Plaintiff was called to the stand on the hearing before the Civil Service Commission, and his undisputed testimony tends to establish the following facts:

John J. Lynch for a number of years prior to 1935 was a partner with one M. L. Annenberg of the General News Bureau. This company published a paper and circulated information concerning sporting events and was used by bettors and bookmakers throughout the United States. Plaintiff first met Lynch in 1931. Shortly before, Lynch had been kidnapped by parties unknown and held for $250,000 ransom. He paid $50,000 of the ransom money, and in order to secure his release, agreed to pay the additional money requested. Plaintiff was introduced to Lynch by Dr. Michael F. Howe, a dentist who had offices in a downtown loop building, who was described by the plaintiff as "sort of a police fan and a very good friend of mine." Plaintiff testified that at the time he met Lynch the latter was very "jittery" about the kidnapping, "and I was with him as often as I could be, so that it did not interfere with my police duties. I went around with him. I took him everywhere he wanted to go. Naturally, I was a police officer and I acted, probably, in the capacity of a body guard for him. However, I did not do anything wrong. I did not consider that I was doing work as a member of the Police Department at any time when I acted as a body guard. I got to know him very well. I got to know him well enough that I visited his home in Lake Geneva. He met my wife and I met his wife, and his wife came to my home and my wife went out to his home."

In 1934 Lynch sold all his interest in the General News Bureau and received a final payment in 1935 which was almost a million dollars. In 1937, according to plaintiff's testimony, there was some conversation between Lynch and himself about the latter going into business which Lynch offered to finance. Plaintiff stated that he would not want to go into business. Then appears the following testimony from plaintiff:

"So, two or three nights later I met him at the Drake Hotel, he and I together, and we had dinner at the Drake Hotel and he gave me an envelope with $30,000 in it in hundred dollar bills. He told me, 'Here, buy some securities for your wife, yourself and your daughter; in case you should get shot in the line of duty, they will have something, and if you don't, you will have it for your older days.' I said, 'Jack, you know that anything I have done for you, I never expected to be repaid.' He said, 'I know that.' I says, 'From the way this envelope feels, there is plenty of money in there.' He said, 'Yes, I have plenty more, so don't worry about it and don't worry about repaying it.' "

This payment by Lynch to plaintiff was admittedly never reported to the commissioner of police. Plaintiff continued to act as bodyguard for Lynch until the latter's death in 1945. On May 10, 1938, plaintiff was promoted from lieutenant of police to the rank of captain.

The limitations placed by our Supreme Court upon reviews from administrative bodies have been variously defined. In *City of Aurora v. Schoeberlein,* 230 Ill. 496, our Supreme Court held in effect that administrative bodies, being executive in nature, cannot assume or exercise any part of the judicial power; that they are authorized by statute to remove an officer for cause after hearing and opportunity to make a defense and that authority implies the power to judge of the existence and sufficiency of the cause; but that there is no such thing as title or property in a public office and the removal of an officer is not the exercise of judicial power; that an appeal is a step in a judicial proceeding, and in legal contemplation there can be no appeal where there has been no decision by a judicial tribunal. The court in *People v. City of Chicago,* 234 Ill. 416, followed the *Schoeberlein* case, but suggested, without deciding, that for certain limited pur-

poses courts might inquire into the good faith of the administrative body, using the following language (p. 421):

"Where acts and duties necessarily call for the exercise of judgment and discretion on the part of an officer, body or person at whose hands performance is required, *mandamus* will not lie to direct how such discretion shall be exercised. . . . Even granting that the courts have power, by *mandamus,* to review the findings of such civil service commissioners where their discretionary power has been grossly abused or exercised for selfish and unworthy motives or in an arbitrary or capricious manner, which we do not here decide, yet there is nothing in this record which tends to show that the discretion of the trial board . . . was not exercised in a proper manner."

Later this doctrine began to yield to permit a weighing of the evidence by courts of review for the purpose of determining whether or not the administrative body abused its discretion. *Liberty Foundries Co. v. Industrial Commission,* 373 Ill. 146, 154; *Brotherhood of Railroad Trainmen v. Elgin, J. & E. Ry. Co.,* 374 Ill. 60, 62–63. Finally, in the case of *Drezner v. Civil Service Commission,* 398 Ill. 219, the court laid down the following principle (p. 227):

"We have also held that it is not within the province of the court to disturb the findings of fact made by an administrative agency unless manifestly against the weight of the evidence, but, on the other hand, if the finding of the administrative agency is against the weight of the evidence, it is the duty of the court to set aside the decision of the administrative agency. . . .

"While the Administrative Review Act does not purport to give a reviewing court the right to reweigh the evidence in the cause appealed from, still the courts have the power, as indicated by the decisions herein

412

cited under other administrative acts, to consider the record to determine if the findings of the administrative agency are borne out by the evidence in the cause and whether or not the findings are against the manifest weight of the evidence or if there is substantial evidence in the record to support the findings.''

We make no attempt to reconcile the above decisions. Whether the instant record is reviewed for the limited purpose of determining on the one hand whether the plaintiff had a legal hearing before the Civil Service Commission and the Commission was not guilty of bad faith or gross abuse of discretion, or, on the other hand, whether the record is reviewed for the purpose of determining whether the findings reached by the Civil Service Commission were against the manifest weight of the evidence, the result we have reached, whichever premise is adopted, would be the same.

Two important facts are undisputed in this record: first, that plaintiff admittedly received a substantial gift of $30,000 from a person for whom at the time he was performing the service of bodyguard, and second, that no consent for the acceptance of this gift was applied for or received from the commissioner of police. Plaintiff insists that he was not required to secure consent of the commissioner for the reason, as set forth in his brief, ''that his association with Lynch was that of a personal friend; that he neither rendered nor pretended to render any services whatever to Lynch 'as a member of the department'; that the gift from Lynch to plaintiff was neither given nor received 'for services rendered as a member of the department'; and that, therefore, the reporting provisions of Departmental Rule 389 (29) were properly found by the lower court to have no application to the incident.''

█ As we analyze this theory, it seems to be implied that if the service in question was rendered by

413

plaintiff to Lynch from motivations of friendship it necessarily was not rendered "as a member of the police department." We do not think any such conclusion logically follows. Obviously one acting for another in the capacity of policeman may at the same time be motivated by feelings of friendship. The relationships of policeman and friend are not mutually exclusive. However, it is not the motive or feeling inspiring the service which is determinative of the fact as to whether or not the services were rendered as a member of the police department, but rather the nature of the services themselves and the circumstances surrounding their rendition. The capacity in which the services were rendered in this case must be determined, not by subjective, but by objective standards.

Furthermore, the assertion that the services performed were at all times motivated solely by friendship is challenged by the undisputed facts of record. In 1931, when Lynch was kidnapped by unnamed enemies and held for ransom, he had never met plaintiff, but a short time after this incident the two were introduced by a mutual friend who was a police fan. Thus at the time the bodyguard services commenced the two men were comparative strangers. The inference which the Civil Service Commission was entitled to draw from this circumstance, and it seems to us the only reasonable one that could be drawn from it, was that Lynch prior to and at the time of his first meeting with plaintiff was anxious to procure a proficient police guard, and his friend Howe, the police fan, in furtherance of that end introduced him to Howe's police friend, the plaintiff. Plaintiff's meeting with Lynch, it may reasonably be inferred, was not a casual one from which a friendship later developed, but was for the purpose of making an arrangement whereby he would provide protection, if the occasion arose, from enemies

414

from whom Lynch feared physical violence. It is apparent from plaintiff's testimony that he himself considered it within the legitimate scope of his duties as a police officer to afford Lynch protection the latter requested and that he was acting, at least at the beginning of this association, in the capacity of police officer. That a friendship later developed was practically inevitable. Being together in such an intimate association, it is a fair inference that they would either become friends or Lynch would seek a new bodyguard. Relationships where a policeman might render services to another which would not be in the nature of police duties would be those unrelated to the requirements of the police service. Such a one assisting in the building of a friend's house or acting as best man at a friend's wedding would not be so engaged in the capacity of police officer, but such services are clearly distinguishable from those of a bodyguard which are essentially a police function. No cases are cited tending to support plaintiff's theory that plaintiff's services were not rendered ''as a police officer.'' We are of the opinion that the conclusion of the Civil Service Commission that the services were performed as a police officer is supported by evidence and is not unreasonable or arbitrary.

██ Plaintiff argues that because he received a civil service promotion after the alleged violation of the departmental rule he cannot be discharged for such prior violation. At the time of the acceptance of the gift in 1937 plaintiff was a lieutenant of police, and in May of 1938 he was promoted to the rank of captain. Plaintiff relies upon the case of *Rosenfelder v. Huttoe,* 156 Fla. 682, 24 So. (2d) 108, where the defendant had been appointed to the police force as a patrolman in 1930, and in January of 1936 was promoted to the rank of detective. In November of 1936 he was promoted to the rank of detective sergeant, and in July of 1940

was promoted to detective. lieutenant, which position
he held until dismissed by the director of public safety.
He was charged, among other things, with having
taken part in several political campaigns in violation
of the civil service rules prior to his promotions. Plain-
tiff relies upon language in the opinion to the effect
that when one is re-elected or reappointed to an office
or position he is not subject to removal for offenses
previously committed. We think that the distinction
between this and other cases cited by plaintiff and the
instant case is that in the former the original offenses
were open and notorious, whereas in the instant case
the transgression was surreptitious. So far as the
record shows, the only persons having any knowledge
of the gift were plaintiff and Lynch, it having been de-
livered in cash in a sealed envelope at a time when and
place where there were no witnesses. We are not im-
pressed with the argument that any transgression in
the past life of a civil service employee must be dis-
covered by the Civil Service Commission prior to pro-
motion else the Civil Service Commission is powerless
to discipline an employee for offenses secretly commit-
ted, concealed, and discovered only after promotion.
We feel that such a rule would be violative of sound
public policy and has no support in any authority in
this State. On the contrary, in *People ex rel. Sweitzer
v. Gill,* 291 Ill. App. 321, it was held that one could be
removed from public office for acts previously com-
mitted in another public office.

 Plaintiff further argues that there is no proof
that the $30,000 gift was for services rendered. It is
true that plaintiff testified that he told Lynch he did
not expect any compensation for services rendered, but
the fact remains that he had rendered valuable and
important police service over a long period of time,
and it was not unreasonable for the Civil Service Com-
mission to conclude that the payment made to plaintiff

.was a gift for this service admittedly performed. Indeed, plaintiff's own reaction at the time the $30,000 was handed to him would seem to create an inference that he considered it in recognition of services rendered, as indicated by his statement: "Jack, you know that *anything I have done for you,* I never expected to be repaid."

■ The Civil Service Commission having lawfully determined that plaintiff violated section 29 of rule 389, he became subject to discipline. The Civil Service Commission pronounced the discipline to be enforced as dismissal from the police force. The Civil Service Act (Ill. Rev. Stat. 1951, chap. 24½, par. 51) [Jones Ill. Stats. Ann. 23.052] provides that a municipal civil service employee may not be removed "except for cause, upon written charges and after an opportunity to be heard in his own defense." The hearing here was regular and in conformity with law in all respects. In the case of *Kammann v. City of Chicago,* 222 Ill. 63, which involved the removal of an employee in civil service for cause, after an investigation of written charges before the Civil Service Commission, the court pointed out that the statute is silent as to what constitutes cause, saying: "Manifestly the right to determine that question is left with the civil service commission." To the same effect are our holdings in *Drury v. Hurley,* 339 Ill. App. 33, and *Joyce v. Board of Education,* 325 Ill. App. 543. In view of our conclusion it is unnecessary to decide whether plaintiff's conduct was violative of the other rules referred to in the complaint. We hold that the trial court erred in vacating the order of discharge entered by the Civil Service Commission, and said judgment of the Superior Court of Cook County is reversed.

*Judgment reversed.*

SCHWARTZ, J., specially concurring:

The limitation on the power of courts in cases of this character stems from the constitutional division of the powers of government into three departments—legislative, judicial and executive, as provided by Article 3 of the Illinois Constitution. That article further provides that no person or collection of persons, being one of these departments, shall exercise any power properly belonging to either of the others, except as may be otherwise provided for by the constitution. In *City of Aurora v. Schoeberlein*, 230 Ill. 496 (opinion by MR. JUSTICE CARTWRIGHT), the Supreme Court of this State held unconstitutional an act providing for full judicial review of proceedings such as are under consideration in the instant case. It held that the discharge of an officer was an executive act; that there is no title or property in a public office; that the removal of an officer is not an exercise of judicial power and hence not judicially reviewable. The court made a distinction between such acts and the exercise of judicial power which adjudicates upon and protects the rights and interests of individuals, such as cases involving workmen's compensation or utility regulation, saying:

"The cases in which appeals from non-judicial bodies to courts have been recognized have involved individual or property rights of which the court had jurisdiction under some other form of procedure, and belonged to classes of cases in which the court, acting judicially, could afford a remedy. This proceeding is not of that character."

The court held that the legislature could not confer judicial power upon a civil service commission and, of course, could not confer executive power upon the court. That decision has been reaffirmed at least three

418

times by the Illinois Supreme Court. *People v. City of Chicago,* 234 Ill. 416; *McQuade v. City of Joliet,* 293 Ill. 515; *Hopkins v. Ames,* 344 Ill. 527. Numerous decisions of the Appellate Court in civil service cases also reiterate the same principle. *Schlau v. City of Chicago,* 170 Ill. App. 19; *Johaaski v. City of Chicago,* 274 Ill. App. 423; *People ex rel. Fosse v. Allmann,* 329 Ill. App. 296; *Drury v. Hurley,* 339 Ill. App. 33.

The legislature, notwithstanding the decision in *City of Aurora v. Schoeberlein, supra,* again sought to involve the judiciary in the execution of civil service functions. In lieu of the section held unconstitutional, it passed an amendment to the Civil Service Act which provided that charges against an officer should be heard by a trial board consisting of the county judge, a judge of the circuit court, and a third person. The Supreme Court in *McQuade v. City of Joliet, supra,* held this amended Act unconstitutional, saying:

"While the trial board which section 12 attempts to provide is not a court, the persons of whom it is constituted are of the judicial department and are prevented by article 3 of the constitution from the exercise of executive powers. The amendatory Act of 1913 is void."

In *Hopkins v. Ames, supra,* the court held that if the Commission acted upon evidence, the court had no right to review its findings, and then said the following:

"To allow a review of the evidence by the courts on investigations conducted by the civil service commission or under its direction would be the exercise of executive powers, which the separation of departments of the government precludes the courts from exercising."

As late as 1951, this court in the case of *Smith v. Civil Service Commission,* 343 Ill. App. 267, cited and

adhered to the principle thus stated in the case of *Hopkins v. Ames, supra.*

The foregoing decisions have made it *stare decisis* that the constitutional limitation on the power of the judiciary does not permit it to review or weigh the evidence in cases of this character. We are aware that in *Drezner v. Civil Service Commission,* 398 Ill. 219, and the cases that follow it, the court did not consider or apply this principle. The distinction between appeals involving the Civil Service Commission and appeals from administrative bodies, such as the Industrial Commission or the Illinois Commerce Commission, does not appear to have been presented and is not discussed by the court. We do not believe that the court intended to overrule the sound and wholesome principle so firmly established by the cases we have cited.

This does not mean that a court may not examine the evidence for any purpose. It may do so for the purpose of determining whether the trial was a farce, or the conclusions of the commission capricious, unreasonable and arbitrary. The ultimate purpose of this examination is the solution of the question—"Was he discharged for cause?" or was the proceeding a cloak for action motivated by political or other personal bias?

Therefore, while I concur in the conclusions reached in the opinion of the court with respect to the facts in this case, I feel that we should adhere to the principle laid down in *City of Aurora v. Schoeberlein, supra,* and the later authorities.

MR. PRESIDING JUSTICE ROBSON specially concurring:

As the opinion of JUSTICE TUOHY shows, this proceeding came about through disclosures by plaintiff made to a United States Senate Investigating Committee, commonly known as the Kefauver Committee. After these disclosures, the Commissioner of Police,

■■■■■■■■■■

■■■■■■■■■■

head of the Police Department of the City of Chicago, called upon plaintiff to make a report to him concerning these charges. After receiving the report, the Commissioner, not satisfied with the plaintiff's explanation, filed the charges in question before the Civil Service Commission. That Commission proceeded with the utmost care to observe all the requirements of the law and after a full hearing in which the widest latitude was allowed plaintiff in the presentation of his defense, the decision in question was rendered. No one reading the opinion of the Commission can fail to be impressed with its fairness, its objectivity, and its understanding of the law and of its duties.

There is no evidence whatever that the proceeding was instigated for any reason except out of a sense of duty on the part of those concerned for the purpose of maintaining the discipline and morale of the Police Department. The Police Department of a large city resembles in many aspects a military force. There is the same necessity of discipline and regulation existing in the Police Department as exists in regard to the military department. The discipline and morale must be of the highest and must be enforced in a manner that is effective. Those who have charge ought not to be confronted with the continuous prospect of long and bitter litigation over their decisions when honestly made. (*Coane v. Geary,* 298 Ill. App. 199, 205, 206; *People ex rel. Masterson v. Police Commissioners,* 110 N. Y. 494, 18 N. E. 133, 135.)

For a court to intervene under circumstances such as we have in the case before us can only serve to demoralize the Police Department and frustrate the administrative officers in the faithful performance of their duties.

I think the principle as stated in the specially concurring opinion of JUSTICE SCHWARTZ is sound and that as applied in this case all the findings of the Com-

mission should have been sustained. For courts to adopt a different principle and intervene in cases such as this will not elevate the administration of the civil service law, but will lower the administration of justice by the courts.