STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v. HELEN B. NAGLEE, EDWARD J. GARRITY, AND EDWARD VIRTUE, DEFENDANTS-APPELLANTS.

Argued January 5, 1965—Decided March 1, 1965.

 

 

 

 

 

 

212

*Mr. C. Zachary Seltzer* argued the cause for defendants (*Mr. Angelo D. Malandra,* attorney).

*Mr. Norman Heine,* Prosecutor of Camden County, argued the cause for plaintiff.

The opinion of the court was delivered by

PROCTOR, J. The defendants, Helen Naglee, Edward J. Garrity, and Edward Virtue, were tried before a jury in Camden County and convicted for conspiracy to obstruct the due administration of the Motor Vehicle Traffic Laws.[1] After the

---

[1] *N. J. S.* 2A:98–1 provides:

"Any 2 or more persons who conspire:

\* \* \* \* \* \* \* \*

h. To commit any act for the perversion or obstruction of justice or the due administration of the laws—

Are guilty of a conspiracy and each shall be punished \* \* \* as for a misdemeanor."

trial judge denied their motion for a new trial, they appealed. We certified the matter on our own motion before argument in the Appellate Division.[2]

The indictment charged that between 1959 and June 29, 1961, Helen Naglee was the Violations Clerk and the Municipal Court Clerk, Edward J. Garrity was the Chief of Police, and Edward Virtue was a police officer, all in the Borough of Bellmawr. The indictment further charged that between those dates the defendants had agreed to dispose of eight drunken driving cases (*N. J. S. A.* 39:4–50) by altering to a lesser charge the tickets issued by the defendant Virtue; that in furtherance of the conspiracy entries were made in the municipal court dockets showing that the traffic offenders appeared in open court and were fined by the magistrate, when in fact no hearings were held. It was further alleged that Chief Garrity required some of the offenders to post bail and then arbitrarily fixed the fines; in some instances Chief Garrity diverted the difference between the amount of the bail and the amount of the fines to unauthorized uses.

The State in its case in chief offered in evidence several traffic tickets issued by the defendant Virtue. One of these had been altered from drunken driving to improper passing, and the others from drunken driving to careless driving. The State also introduced receipts given to the offenders signed by Helen Naglee or Chief Garrity. Several of the receipts indicated that the traffic offender had also been fined for disorderly conduct. The municipal magistrate testified that his purported signature on several of the traffic tickets was a forgery. Eight alleged traffic offenders testified that they were originally charged by Virtue with drunken driving, that they had paid a fine for offenses other than drunken driving, but that they had never appeared before the municipal magistrate. Several testified that they had posted cash bail for their appearance, and after talking to Virtue and Garrity, had paid

---

[2] While the appeal was pending, Helen Naglee died. Her appeal will nevertheless be considered pursuant to *R. R.* 1:2–4(b). See *City of Newark v. Pulverman*, 12 *N. J.* 105 (1953).

Garrity a "fine" for careless driving and a "fine" for disorderly conduct. In several instances where the amount of the bail posted was greater than the fine assessed, the difference was not returned to the traffic offender.

Dr. Cooperman testified that he had examined, on behalf of the borough, several of the alleged offenders for intoxication; that he had made records of his findings and turned them over to the police department, but he had not retained written copies and could not recall the results of the tests. Deputy Attorney General Budd M. Rigg and Detective John F. Corbin of the New Jersey State Police Department, who had been assigned pursuant to an order of this court, to investigate the altering of tickets in the borough, both testified that Chief Garrity had told them that he had disposed of Dr. Cooperman's medical reports because the tickets had been downgraded.

The State introduced in evidence two statements made by each defendant. The first statement was given to Deputy Attorney General Rigg on November 10, 1961, and the second was given to Camden County Assistant Prosecutor Sidney Kaplan in December 1962.

Defendant Virtue in his statement of November 10, 1961 to Mr. Rigg, admitted that he had participated in the practice of altering tickets. Defendant Naglee in her statement to Mr. Rigg admitted that she had altered tickets at Chief Garrity's request and that she had made notations indicating that the alleged traffic offenders had appeared in court, had pleaded guilty and were fined by the magistrate, when in fact they had never appeared. She also admitted that she had signed the magistrate's signature on several traffic tickets. In his statement to Mr. Rigg, Chief Garrity said that no tickets could be altered without his consent. With reference to one alleged offender who had posted bail of $225, Garrity said that he had come to an understanding with the offender, that the offender could pay a total fine of $140 and not appear in court; that the $85 balance was placed in an envelope and kept in a safe in the police station.

In defendant Virtue's statement to Mr. Kaplan, he admitted that one of the eight alleged traffic offenders was examined and found to be under the influence of alcohol, but the charge had been downgraded to careless driving because a hardship was involved. He also admitted that the change on the face of another of the eight tickets was in his handwriting and that he had consented to a change in a third case. Mrs. Naglee, in her statement to Mr. Kaplan, stated that she had made the changes in the cases of five of the eight alleged traffic offenders. She admitted signing the magistrate's name below an entry which indicated a court hearing, a plea of guilty and the imposition of a fine in two cases. She stated that where tickets were altered, the arrested person, if he had a hardship, would go to the arresting officer and that the officer would refer the case to Chief Garrity. Garrity, in his statement to Mr. Kaplan, stated that before he would direct Mrs. Naglee to alter a ticket he would obtain the arresting officer's consent. He admitted changing a number of drunken driving charges to careless driving and disorderly conduct.

All of the defendants testified in their own defense. All said that they did not receive any money for their personal gain.

Helen Naglee testified there was no express agreement between Garrity, Virtue and herself to alter tickets. However, she admitted that she had altered tickets at Chief Garrity's request. She said that she did not know it was wrong to alter the tickets although she did know persons charged with disorderly conduct were supposed to appear in court. She said that the excess money paid by the alleged traffic offenders was kept in a locked drawer in her desk.

Defendant Virtue testified that there was no agreement between Garrity, Naglee and himself to alter tickets. However, he admitted that one of the eight cases had been altered because of hardship. He also admitted downgrading another ticket because it was a "borderline case." In the other cases the doctor's examination had revealed insufficient intoxication to press the charge, and therefore the charge was altered.

He said that the tickets for drunken driving were given on the highway and that the alterations took place after the doctor's examination. He said that he had destroyed the drunkometer reports with Chief Garrity's consent because they did not show legal intoxication.

Garrity, like Virtue and Mrs. Naglee, testified that he had not conspired to alter any tickets. He said that in six of the eight cases the tickets were altered after conferring with Virtue because intoxication could not be proved. In four of the cases he stated that the alleged traffic violators had made donations to the police fund for equipment of the difference between the balance they had originally paid and the fine eventually imposed. Chief Garrity admitted that he had instructed Mrs. Naglee to make entries in the court dockets to show that six of the offenders had appeared in court, when actually none of them had appeared.

In rebuttal, the State called five of the alleged traffic offenders who all testified, in contradiction to the defendant Virtue's testimony, that the tickets were issued in police headquarters and not on the highway. Two of these witnesses also testified, in contradiction to Chief Garrity's testimony, that they did not indicate to him that they were making donations for police equipment.

On this appeal, the defendants Garrity and Virtue contend that their statements, taken by Deputy Attorney General Rigg and Assistant Prosecutor Kaplan, were erroneously introduced into evidence because they were involuntary. They contend that their statements were coerced by Mr. Rigg's threat that if they failed to give a statement, they would lose their positions with the police department.

Before Mr. Rigg took the statement of Virtue, he advised him:

"* * * I want to advise you anything you say must be voluntary, of your own free will, without threats or coercion or promise, or reward and anything you do say may be used against you or any person in a subsequent criminal proceeding, or proceedings, in the courts of our state. You do have under our statutes, as you may know, a privilege

to refuse to disclose any information which may tend to incriminate you. However, if you make such a disclosure, with knowledge of this right and without coercion, you thereby waive this right or privilege with regard to any phase of this investigation. *This right or privilege that you have is limited to the extent that you as a police officer once sworn and asked questions pertaining to your office and your conduct therein, if you refuse to answer, you may then be subject to a proceeding to have you removed from the department.*" (Emphasis supplied)

A similar preliminary statement was given to the defendant Garrity. The preliminary statement given by Mr. Rigg to Mrs. Naglee did not contain the emphasized warning quoted above.

Historically, the initial reason for excluding an involuntary confession was the fear it was untrue. But a second reason not at all inconsistent with the first, but which may operate independently of the risk of untruthfulness is the desire to enforce decently restrained behavior by police officers. See *Rogers v. Richmond,* 365 *U. S.* 534, 541, 81 *S. Ct.* 735, 5 *L. Ed.* 2d 760, 766–67 (1961), where the court stated that the constitutional exclusion of involuntary confessions rests not upon their probable untruth but rather upon the unconscionable methods used. See also *Maguire, Evidence of Guilt,* 109 (1959). Thus, in determining whether a confession is involuntary courts have considered not only the degree and extent of the compulsion used to make the declarant confess, but also whether the nature of the interrogation was fair. Of course, an involuntary confession is inadmissible. The test for determining involuntariness is whether the defendant's will was overborne and his capacity for self-determination critically impaired. *Culombe v. Connecticut,* 367 *U. S.* 568, 602, 81 *S. Ct.* 1860, 6 *L. Ed.* 2d 1037, 1057–1058 (1961); *State v. Wade,* 40 *N. J.* 27, 35 (1963). This test implies that some coercion may exist when a statement is taken without being of sufficient strength to overbear the will of the declarant. As a matter of common knowledge every official interrogation, no matter how civilly conducted, by its very nature tends to compel the person questioned to answer. Thus, the term "coerced confession" in a sense is a misnomer

since virtually all confessions are accompanied by some degree
of coercion.[3] Therefore, an appellate court must examine the
entire record to determine not merely whether coercive pres-
sures were present, but whether under the totality of the cir-
cumstances they were of an offensive nature and were suffi-
cient in degree to render the declarant incapable of freely
exercising his will.

Before the defendants' statements were introduced in evi-
dence, the trial court held a preliminary hearing in the ab-
sence of the jury to determine the voluntariness of the state-
ments. The State's evidence showed that the statements of
the defendants were given under the following circumstances:
Assistant Attorney General Rigg, as a result of an order is-
sued by this court on June 30, 1961, had begun an investiga-
tion of alleged irregularities in the Bellmawr Municipal
Court. After a long preliminary investigation, during which
he had talked to Chief Garrity on several occasions, he had
scheduled the taking of statements from the defendants dur-
ing the last week of October, but he postponed the interroga-
tions until November 10, 1961. The defendants were interro-
gated in a room in the firehouse which was adjacent to the
police station in Bellmawr. Chief Garrity had made arrange-
ments for Mr. Rigg to use this room for the interrogations.
The statements were taken during the day and there is no
evidence to indicate that the defendants were questioned or
detained for any period of time before the actual statements
were taken. Nor is there any evidence that the defendants
were reluctant to give the statements. Mr. Rigg testified that
as he and Chief Garrity were walking to the firehouse, Gar-

---

[3] As Justice Hall said in *State v. Smith*, 32 *N. J.* 501, 550 (1960),
*cert.* denied, 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed.* 2d 367 (1961):

"An interrogation, no matter how conscientiously conducted, is
naturally bound to be a tense occasion and to evoke apprehension,
nervousness and a sense of pressure. no matter what the situation,
which will be heightened in a person who knows he is guilty by con-
sciousness of guilt and fear of the legal penalty. It must be recognized
that it is not this kind of normal stress, fear and pressure which can
make the questioning unfair and a confession involuntary."

rity told him that he had arranged for counsel but that he did not think counsel would be necessary at that point. Mr. Rigg and Lawrence Garifo, the court stenographer who took the statements, both testified that although the defendants were nervous at times, nothing unusual occurred during the interrogations.

 Although the defendants at the preliminary hearing had full opportunity to testify concerning the voluntariness of their statements, none took the stand. There is therefore no evidence that their statements were in fact coerced by the preliminary statement made by Mr. Rigg. There is nothing in the record inconsistent with the conclusion that each defendant came to the fire hall with the intention of making a statement. Nor is there anything to suggest that the interrogation was not conducted in a polite and civil manner with due consideration for the defendants' comfort. The record lacks all of the elements of coercive tactics which were present in prior cases holding confessions to be involuntary. Here there is no physical coercion, no overbearing tactics of psychological persuasion, no lengthy incommunicado detention, or efforts to humiliate or ridicule the defendants. The overt circumstances show that the interrogation was conducted with a high degree of civility and restraint. We are convinced that the State sustained its burden of proving that the degree of coercion exerted upon the defendants could not have been sufficient to overbear their wills.

Defendants contend that Mr. Rigg's "threat" constituted a type of coercion which he was not entitled to assert. They urge that the Deputy Attorney General was alluding to *N. J. S.* 2A:81–17.1.[4] However, he neither referred to the

---

[4] *N. J. S.* 2A:81–17.1 provides:

"Any person holding or who has held any elective or appointive public office, position or employment (whether State, county or municipal), who refuses to testify upon matters relating to the office, position or employment in any criminal proceeding wherein he is a defendant or is called as a witness on behalf of the prosecution, upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself or refuses to waive immunity when called by

statute by name nor quoted from it. He merely said, "This right or privilege [of refusing to answer on the ground of self-incrimination] that you have is limited to the extent that you as a police officer once sworn and asked questions pertaining to your office and your conduct therein, if you refuse to answer, you may then be subject to a proceeding to have you removed from the department."

As policemen, Garrity and Virtue held sensitive positions in regard to reporting and prosecuting violations of the law. Surely, a police officer who refuses to cooperate in a proper investigation of his official conduct is acting inconsistently with his police duties. He is therefore properly subject to subsequent dismissal proceedings. *Fallon v. New Orleans Police Department,* 238 *La.* 531, 115 *So.* 2d 844 (*Sup. Ct.* 1959); *Fichera v. State Personnel Board,* 217 *Cal. App.* 2d 613, 32 *Cal. Rptr.* 159, 163 (*D. Ct. App.* 1963); see also *Canteline v. McClellan,* 282 *N. Y.* 166, 25 *N. E.* 2d 972 (*Ct. App.* 1940); *Souder v. Philadelphia,* 305 *Pa.* 1, 156 *A.* 245, 77 *A. L. R.* 10 (*Sup. Ct.* 1931); *Scholl v. Bell,* 125 *Ky.* 750, 102 *S. W.* 248 (*Ct. App.* 1907). The obligation to cooperate does not depend on the existence of a statute or rule. It is intrinsic to the position of a police officer. *Christal v. Police Comm. of San Francisco,* 33 *Cal. App.* 2d 564, 92 *P.* 2d 416 (*Sup. Ct.* 1939). See also *Drury v. Hurley,* 339 *Ill. App.* 33, 88 *N. E.* 2d 728 (*Sup. Ct.* 1949); and *In re Emmons,* 63

---

a grand jury to testify thereon or who willfully refuses or fails to appear before any court, commission or body of this State which has the right to inquire under oath upon matters relating to the office, position or employment of such person or who, having been sworn, refuses to testify or to answer any material question upon the ground that his answer may tend to incriminate him or compel him to be a witness against himself, shall, if holding elective or public office, position or employment, be removed therefrom or shall thereby forfeit his office, position or employment and any vested or future right of tenure or pension granted to him by any law of this State provided the inquiry relates to a matter which occurred or arose within the preceding five years. Any person so forfeiting his office, position or employment shall not thereafter be eligible for election or appointment to any public office, position or employment in this State."

*N. J. Super.* 136 (*App. Div.* 1960). It is to be noted that the above cases recognize the right of a policeman to assert his privilege against self-incrimination; but he may be discharged for doing so. A subsequent discharge is not predicated upon an inference of guilt from the police officer's refusal to testify, but upon his failure to cooperate in a situation where his duty compels cooperation. See the discussion in Ratner, "Consequences of Exercising the Privilege Against Self-Incrimination," 24 *U. Chi. L. Rev.* 472, 503–504 (1957).

We therefore conclude that Mr. Rigg's warning to Garrity and Virtue that their refusal to answer his questions might subject them to removal proceedings was a type of compulsion which may be legitimately used.

Defendants contend that their subsequent statements taken by Mr. Kaplan were involuntary and hence inadmissible. They argue that even though Mr. Kaplan made no suggestion that they might lose their jobs, Mr. Rigg's "threat" controlled the character of their later statements and rendered them inadmissible. Since we have concluded that Mr. Rigg's so-called threat did not make the statements given to him involuntary, it follows that the "threat" could not make the statements given to Mr. Kaplan involuntary.

Defendants also allege in their brief that additional coercive pressures were exerted upon them during Mr. Kaplan's interrogation. Our examination of the record shows this allegation to be without substance.

The defendants further contend that their statements were involuntary because neither Mr. Rigg nor Mr. Kaplan advised them of their right to counsel. While failure to advise a suspect of his right to counsel is an element to be considered on the issue of voluntariness of an inculpatory statement, the weight to be given this factor depends upon the circumstances of the interrogation. Unlike most suspects, the defendants here were intimately associated with law enforcement and it would be unreasonable to assume that they were not aware of their rights in this situation. There is no suggestion that had the defendants asked that their counsel be

present, such request would have been denied. Indeed, Chief Garrity prior to the interrogation told Mr. Rigg that he had arranged for counsel but that he had decided that counsel's presence at that point would be unnecessary. The defendants do not claim that the trial judge did not consider the interrogator's failure to warn them of their right to counsel. We therefore conclude that in the circumstances of these interrogations the failure to advise the defendants did not render their statements involuntary.

The defendants rely upon *Escobedo v. State of Illinois,* 378 *U. S.* 478, 84 *S. Ct.* 1758, 12 *L. Ed. 2d* 977 (1964), decided since their trial. That case is a far cry from the situation before us. There the suspect was accused of murder. He was taken into custody and grilled at the police station. He refused for several hours to give the police his statement and it was only after a denial by the police of his repeated requests to see his lawyer, and his lawyer's repeated requests to see him, that he confessed. In that case the denial of counsel could have been a significant factor in producing the defendant's confession. But under the circumstances of the present case which we have outlined above, we conclude that the absence of advice to these defendants was not a significant factor in obtaining their statements.

We hold the trial judge was correct in his determination that the statements given by the defendants were admissible.

The defendants further contend that *N. J. S.* 2A:81–17.1 is unconstitutional. As we have mentioned earlier in this opinion, Mr. Rigg did not expressly threaten to invoke the sanction of the statute against the defendants Garrity and Virtue. The warning he gave them was to the effect that if they did not cooperate in the investigation they might be subject to dismissal as a result of a subsequent proceeding. We determined that such a dismissal would be proper even in the absence of a statute. Therefore, we conclude that the defendants, in the circumstances of this case, are not in a position to challenge the constitutionality of the statute.

■ The defendants in their brief have made a point which we have not previously discussed. They contend that a public official may not be subjected to a penalty (here the loss of employment) because of the exercise of a legal right (here the constitutional right to refuse to answer questions on the ground that the answers would be self-incriminatory). But there are situations where a public official's right to retain his position may properly depend upon a willingness to forego a constitutional right to the extent that the exercise of such a right may be inconsistent with the performance of the duties of his position. For example, a member of the judiciary of this State cannot engage in partisan political activity.

■ The question is not whether the State can require an employee to forego the exercise of the constitutional right. Of course it cannot. The question is whether the State's requirement that a given employee forego a given constitutional right as a condition of continued employment is *reasonable*. We need not now determine whether it would be reasonable for the State, under other circumstances, to dismiss employees holding other public positions because they refuse to answer questions on the ground of self-incrimination. See Ratner, *supra,* at *pp.* 504–511. We think it reasonable, however, for the State, in a proper proceeding, to dismiss a police officer for refusal to answer questions pertaining to his official position in an investigation such as the one conducted here.

■ The defendants next contend that the failure of the State to introduce evidence before the jury on the issue of the voluntariness of their statements was plain error. See *R. R.* 1:5–1(a). It is settled in this State that when the State seeks to introduce the out-of-court statement of a defendant in a criminal trial the trial judge must make his own finding upon the issue of voluntariness; and if he finds the statement to be voluntary and hence admissible, he must instruct the jury to consider the same issue and to disregard the statement unless it finds the State has proved the statement was voluntarily obtained. *State v. LaPierre,* 39 *N. J.* 156, 162–163,

*cert.* denied, *Bisignano v. New Jersey,* 374 *U. S.* 852, 83 *S. Ct.* 1920, 10 *L. Ed. 2d* 1073 (1963).

When the State sought to introduce the defendants' statements in evidence, the jury was excused and the court conducted a hearing to determine their admissibility. The court initially considered the voluntariness of the statements. The State produced several witnesses who testified to the manner in which the statements were taken. The defendants offered no contradictory testimony. The court held that the statements were voluntary. The court then considered whether certain parts of the statements should be deleted as irrelevant. After a lengthy discussion with counsel, numerous deletions were made. The court then proposed that the stenographer, who had transcribed the statements, read them as deleted to the jury. Both counsel for the State and the defendants acquiesced, and the statements were then read to the jury. The State did not repeat the testimony as to the manner in which the statements were taken and the defendants again offered no testimony on the issue of voluntariness. When the statements were read to the jury, the defendants made no objection on the ground that the State had offered no evidence of voluntariness for the jury's consideration. The trial court did not mention the question of voluntariness in its charge, and the defendants again did not object. Further, on their motion for a new trial defendants did not raise the issue.

The State contends that its failure to present evidence to the jury on the issue of voluntariness is attributable to an understanding among the trial court, the prosecutor and defense counsel that the State need not present such evidence. At oral argument we directed that this matter be returned to the trial court for clarification. At the hearing conducted by the trial court, the respective recollections of the judge, the prosecutor and defense counsel were somewhat at variance. The judge had not refreshed his recollection by examining the trial record. On our examination of the transcript of this hearing and of the original trial record, we are satisfied that

there was at least an implicit agreement that the State need not produce witnesses before the jury on the voluntariness of the statements. It is clear that the defendants were not urging involuntariness in the traditional sense, but rather only the narrow legal issue which we have previously discussed. There was therefore no reason for the trial court to charge the jury on that issue. In any event, it cannot be said in the circumstances of this case that the omission was prejudicial error since in our opinion the jury as reasonable men could not have found the statements to have been involuntary. See *State v. Smith,* 32 *N. J.* 501, 560 (1960), *cert.* denied 364 *U. S.* 936, 81 *S. Ct.* 383, 5 *L. Ed. 2d* 367 (1961). *A fortiori,* the omission was not plain error, as it could not have had the clear capacity to bring about an unjust result. *State v. Corby,* 28 *N. J.* 106, 108 (1958).

The defendants further contend that the acts alleged in the indictment do not constitute the crime charged. They argue that the acts alleged constitute contempt of court under *R. R.* 8 :10–2, and therefore cannot be the crime of conspiracy to obstruct justice under *N. J. S.* 2A :98–1 (h). This point is clearly without merit. This court in the exercise of its rule-making power cannot deprive the Legislature of its right to determine the type of conduct which constitutes a substantive crime.

Finally, the defendants contend that their motions for judgments of acquittal at the end of the State's case and at the end of the entire case should have been granted, and that the verdict was contrary to the weight of the evidence. The State, in its case in chief presented ample evidence, including the statements we have found admissible, from which the jury could properly conclude that the defendants were guilty of the crime charged. The evidence introduced in behalf of the defendants did not refute the State's evidence; indeed, except for a denial of an express agreement, their testimony corroborated the State's proof. The jury could properly find each defendant was acting in agreement with the other defendants in downgrading tickets and falsifying

court records. Participation in a criminal conspiracy need not be proved by direct evidence; a common purpose and plan may be inferred from a development and a collocation of circumstances. *Glasser v. United States*, 315 *U. S.* 60, 80, 62 *S. Ct.* 457, 86 *L. Ed.* 680, 704 (1942).

The judgments of conviction are affirmed.

*For affirmance* — Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN —7.

*For reversal*—None.