108 N.J. Super. 363 (1970)
261 A.2d 396
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LAWRENCE BODE, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 17, 1969.
Decided February 3, 1970.
*364 Before Judges KILKENNY, LABRECQUE and LEONARD.
Mr. Henry J. Franzoni, Jr., argued the cause for appellant.
Donald J. Flanagan, Assistant Prosecutor, argued the cause for respondent (Mr. Charles M. Egan, Jr., Morris County Prosecutor, attorney, on the brief).
PER CURIAM.
Defendant was charged in an indictment with having, on December 1, 1967, unlawfully stolen in the Township of East Hanover one cigarette lighter of the value of $10.97, one package of cigars of the value of $.49, one cigarette lighter of the value of $12.97, and one man's wrist watch of the value of $7.95, in all of the value of $32.38, being the goods and chattels of Vornado, Inc., contrary to the provisions of N.J.S.A. 2A:119-2.
Defendant was tried before a jury and found guilty. He prosecutes this appeal from the judgment of conviction.
On December 1, 1967, about 4:20 P.M., defendant, a police sergeant with ten years' experience, was in charge of the desk at the East Hanover police headquarters, when his superior officer, Chief Schuler, entered the room and asked defendant to accompany him to a new building under construction, "for privacy." They went to this new building, a new police headquarters, to the chief's office there. After *365 they sat down, the chief said to defendant: "You were seen last night taking something from Two Guys. What did you take?" "Two Guys" is the popularly known name of stores operated by Vornado, Inc. Defendant worked part-time in its East Hanover store at night as a stock clerk.
The chief's question was undoubtedly prompted by his having received a call at about 5:30 A.M. at his home from someone connected with "Two Guys" or Vornado.
The chief testified that defendant "broke down a little bit and he told me that he took two cigarette lighters, a pack of cigars and a watch." In the chief's words, "I said, `What the hell did you do that for?' He didn't give me no explanation. So with that I said, `We will go back to our old headquarters and I want you to go and bring back that stuff back to me right away.'" The Chief testified that defendant, who was working the 4 to 12 shift on this particular day, went outside the old building, to which they had returned, got in a patrol car and went in the direction where defendant lived. He was back within approximately eight minutes and handed the chief the four items. The chief put the articles in an envelope, marked it for identification, and later turned the envelope and contents over to the prosecutor. He identified them at trial. The chief's testimony was objected to, but the objection was overruled and the four items were received in evidence, over objection. A pretrial motion to suppress this evidence had been denied.
In his appeal defendant advances three points for reversal, viz:
(1) A police officer is entitled to the same constitutional rights under the Fifth Amendment as any other citizen.
(2) The statement of defendant Bode, as testified to by Chief Schuler, was inadmissible since it was involuntarily obtained under circumstances that were fundamentally unfair.
(3) The goods introduced as evidence against defendant were inadmissible since they were the product of an illegal interrogation.
*366 We consider in the foregoing order of submission the validity of those contentions.

I
It may be conceded that a police officer is entitled to the same constitutional rights under the Fifth Amendment as any other citizen. For example, police officers are constitutionally entitled to protection against the use of "coerced confessions" made by them. Garrity v. New Jersey, 385 U.S. 493, 87 S.Ct. 616, 17 L.Ed.2d 562 (1967). So, too, they may not be compelled to incriminate themselves.
At the same time, under proper circumstances, a police officer may vountarily admit his commission of a crime, as may any other citizen.
In this instant case there was no "coerced confession" by defendant, nor was there any compulsory self-incrimination. In Garrity the police officers were threatened with loss of their jobs if they refused to answer the questions posed. There was a New Jersey statute, N.J.S.A. 2A:81-17.1, providing for forfeiture of office or employment, tenure and pension rights of persons refusing to testify on the ground of self-incrimination. The validity of that statute was not passed upon by our Supreme Court and was deemed unnecessary for consideration in Garrity, supra, 385 U.S. at 496, 87 S.Ct. 616, citing State v. Naglee, 44 N.J. 209, 223 (1965). Garrity and Naglee were limited to a consideration of the voluntariness of the incriminating statements by the police officers.
Defendant argues that his admission to Chief Schuler should have been excluded because he had not been given the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), before his making the incriminating statement. The State's position as to this argument is that defendant was a police officer with ten years of experience and knew the rights of persons accused of criminal acts. It reasons that it cannot be said that defendant *367 was unaware of his rights because he recited the Miranda warnings as part of his police duties in taking statements from others. The State relies upon Coyote v. United States, 380 F.2d 305 (10 Cir.1967), wherein the court stated:
Surely Miranda is not a ritual of words to be recited by rote according to didactic niceties. What Miranda does require is meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act. [at 308]
But Coyote dealt with the sufficiency of the language used in advising defendant of his rights, rather than a total absence of the Miranda warnings, as in this case.
The trial court determined that the Miranda warnings were not necessary in the case of defendant because of his long experience as a police officer and his familiarity with the duty (of the police) to give these warnings to others. However, the court in Miranda discussed the many psychological pressures that may affect a person in custody who is being questioned by the police, and the need of a warning to overcome those pressures. A police officer being questioned about his possible involvement in a crime might not, under that emotional stress, be as conscious of all his rights as the same police officer questioning others.
We would prefer to rest our conclusion of admissibility on the ground that defendant's statement was not made during "a custodial interrogation," as required under the Miranda rule, thus making Miranda inapplicable herein. Defendant was at police headquarters because he was on duty there, and not because he was in police custody. After the episode with the chief, he resumed his work as desk sergeant until midnight, when his tour of duty ended. He was not placed under arrest either that day or at any time thereafter. No criminal complaint was ever filed against him. He was suspended the next day pending the filing of disciplinary charges for a departmental hearing. But the charges were not filed or heard because defendant resigned *368 from the police department a week later. Several months thereafter he was indicted. Accordingly, whatever defendant said to the chief of police was not the product of a "custodial interrogation."

II
The record does not support defendant's claim that his statement was inadmissible because involuntarily obtained under circumstances that were fundamentally unfair.
On the contrary, Chief Schuler's interrogation and conduct were more consonant with that of a protector of a fellow-officer, shielding him by talking with him "in privacy," by making no arrest and keeping him on desk duty for the remainder of the tour, and by making no arrest thereafter or causing any criminal complaint to be filed. It may reasonably be assumed that "well enough" would have been "left alone" by the chief, but for the indictment several months later.
Under the totality of the circumstances, we find no sound basis for defendant's claim that his statement was "involuntarily obtained" or that the circumstances under which it was given were "fundamentally unfair."

III
Defendant's argument that introduction of the goods in evidence was improper, in that they were the product of an illegal interrogation, falls with our disposition of his prior two points. It is true that under Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the doctrine of excluding "the fruit of the poisonous tree" applies to physical or verbal evidence obtained from an illegal entry or from an illegally obtained statement. But that doctrine does not apply here because the major premise upon which the conclusion depends has not been established, as noted above. Accordingly, we find no merit in this claim of error.
*369 We note too, in passing, that there were other State's witnesses who testified to their having personally observed defendant on the night in question, from lookout posts at the store, take the two lighters, cigars and watch and put them in his pocket. Edward Kennedy, general manager, and Harry Hale, security manager, so testified. Kennedy identified the exhibits in court as the type of items he saw defendant take and put in his pocket, having observed him through a pair of field glasses. Kennedy also established in his testimony the respective values of the items. Thus, there was strong direct evidence of defendant's guilt beyond his own inculpatory admission and delivery of the stolen merchandise to the chief of police.
The judgment of conviction is affirmed.