# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3008-18T4

STATE OF NEW JERSEY,

     Plaintiff-Appellant,

v.

J.V.,

     Defendant-Respondent.

_____

Submitted May 20, 2019 – Decided July 3, 2019

Before Judges Messano and Gooden Brown.

On appeal from an interlocutory order of the Superior Court of New Jersey, Law Division, Salem County, Indictment No. 18-06-0222.

John T. Lenahan, Salem County Prosecutor, attorney for appellant (David M. Galemba, Assistant Prosecutor, of counsel and on the brief).

Joseph E. Krakora, Public Defender, attorney for respondent (Emma R. Moore, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

By leave granted, the State appeals from the February 5, 2019 Law Division order, granting defendant's motion to suppress his statement to detectives as well as his accompanying handwritten letter of apology to the alleged victim. In his statement, defendant admitted he engaged in sexual conduct with his live-in girlfriend's underage daughter, Y.N. The State argues the Miranda[1] warnings given to defendant prior to his statement were "adequate" and "'reasonably conveyed' defendant's rights" "in a language defendant understood," and the trial court erred in finding to the contrary. The State argues further that "[b]ecause the court's decision was grounded on a single factor that was unsupported by sufficient credible evidence, and failed to account for the totality of [the] circumstances that demonstrated that defendant fully understood the proceedings and rights he was waiving," it must be reversed. We disagree and affirm.

After then thirteen-year-old Y.N. disclosed to law enforcement that she was sexually assaulted by defendant when she was between eleven and twelve years old, and defendant gave an incriminating statement to detectives corroborating the disclosure, a Salem County grand jury indicted defendant, charging him with first-degree aggravated sexual assault, N.J.S.A. 2C:14-

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

2(a)(1); two counts of second-degree sexual assault, N.J.S.A. 2C:14-2(b); and second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a)(1). At the Rule 104(c)[2] hearing conducted to adjudicate defendant's pre-trial motion to suppress his statement, Salem County Prosecutor's Office (SCPO) Detective Nicholas Efelis testified for the State. Agent Brian Baker of the Federal Bureau of Investigation (FBI) and defendant testified for the defense. A Spanish interpreter was utilized during the entire two-day hearing.

According to Detective Efelis, on March 26, 2018, after interviewing the alleged victim and her mother, he and two other officers went to defendant's place of employment, and asked if defendant would answer some questions about "an open investigation." Defendant agreed and was transported to the Penns Grove Police Department in an unmarked police car. Efelis testified that

---

[2] Rule 104(c) provides in pertinent part:

> Where by virtue of any rule of law a judge is required in a criminal action to make a preliminary determination as to the admissibility of a statement by the defendant, the judge shall hear and determine the question of its admissibility out of the presence of the jury. In such a hearing the rules of evidence shall apply and the burden of persuasion as to the admissibility of the statement is on the prosecution.
>
> [N.J.R.E. 104(c).]

from the initial encounter, defendant spoke English and gave no indication that he did not understand the English language, or that he was confused. Further, during the fifteen to twenty minute ride back to the station, defendant was not handcuffed or placed under arrest, and there was no discussion about the allegations.

Upon arrival, Efelis and Penns Grove Detective Christopher Hemple conducted a videotaped interview in an interview room containing "three desks," "some filing cabinets," and "a couple [of] chairs[.]" The interview began with the detectives collecting basic pedigree information from defendant, who was then thirty five years old. Next, Hemple administered the <u>Miranda</u> warnings[3] by reading the rights in English in their entirety directly from a <u>Miranda</u> card, after which defendant was asked if he understood his rights.[4] In response, defendant nodded his head in the affirmative.

---

[3] Defendant was advised (1) he had the right to remain silent and refuse to answer any questions; (2) anything he said could be used in a courtroom; (3) he had the right to an attorney during questioning; (4) if he could not afford an attorney, one could be brought in; and (5) he had the right to stop questioning at any time. <u>See</u> <u>State v. Nyhammer</u>, 197 N.J. 383, 400 (2009) (delineating the <u>Miranda</u> warnings).

[4] Efelis' phone rang in the interview room while Hemple was reading the <u>Miranda</u> warnings.

Efelis acknowledged that Hemple did not have defendant initial on the card next to each <u>Miranda</u> warning, and did not have defendant read the warnings himself. Efelis also acknowledged that it took Hemple thirty seconds to read the <u>Miranda</u> warnings to defendant. After reading the rights, Hemple flipped the card over to the waiver side, signed the card himself, handed the card to defendant, and asked defendant to sign and date the card.[5] Without reviewing the specific rights affixed to the opposite side of the card, defendant signed the waiver,[6] while the detectives began discussing with him his recent five-day trip to Puerto Rico, as well as the island's recovery efforts in the wake of the hurricane.

Turning to the allegations, when asked whether he knew why he was there, defendant responded he had "heard a little noise." The detectives then informed defendant that Y.N. had made some allegations against him, but they wanted to hear his side of the story. Although defendant eventually admitted having sex

---

[5] The waiver provision stated in both English and Spanish that defendant "acknowledge[d] that [he] ha[d] been advised of the constitutional rights found on the reverse side of th[e] card."

[6] Defendant only had the <u>Miranda</u> card in his possession for a total of sixteen seconds.

with another fifteen-year-old girl who had lived with them two years prior,[7] he initially denied "do[ing] anything sexual[] to [Y.N.]"  Instead, he stated he would only go into Y.N.'s bedroom in the morning, "give her a kiss," and inquire whether "she need[ed] money."

Ultimately, after the detectives repeatedly confronted defendant with Y.N.'s specific allegations that he "touched" and "licked" her breasts and vagina, and unsuccessfully tried to have sex with her, defendant admitted that it "happened" but denied that his intention was to hurt Y.N.  Defendant explained that on one occasion when Y.N. "was laying on [him]" and he became aroused, he stopped himself "[b]ecause . . . [he did not] want to do that to her."  According to defendant, the sexual conduct occurred in 2016 and early 2017, while his girlfriend was working an overnight shift.  He also acknowledged that he told Y.N. not to tell anyone.  Because defendant expressed remorse for what had happened, at the detectives' suggestion, after the interview ended at 1:48 p.m., defendant wrote a letter in English apologizing to Y.N.[8]

---

[7]  According to defendant, when his girlfriend found out, she sent the girl back to her father in New York.

[8]  Defendant's videotaped interview, which was played during the hearing, the Miranda card, and the apology letter were all admitted into evidence.

A-3008-18T4

Efelis testified that during the interview, no promises were made to defendant, and no force or coercion was used. Further, defendant never requested a break and did not appear to be under the influence of drugs or alcohol. However, on cross-examination, in response to questions about defendant's English proficiency, Efelis acknowledged that although defendant's girlfriend had been interviewed with the aid of a Spanish interpreter, he did not ask defendant if he wanted a Spanish interpreter, wanted to conduct the interview in Spanish, or if English was his second language. Additionally, Efelis did not ask defendant how far he went in school or if he knew how to read or write in English or Spanish.

FBI Agent Baker testified that he had contact with defendant in 2016 and 2017 when defendant served as a government witness in a federal case. According to Baker, although defendant communicated in both English and Spanish, "Spanish was clearly [defendant's] first language," and a Spanish interpreter was used during witness preparation and when defendant appeared in court.

Through the Spanish interpreter, defendant testified that he was born, raised, and educated in Puerto Rico. Because all his classes were in Spanish, he only "learn[ed] English in the streets with friends." He acknowledged that

7

although he did "understand English[,]" he had "difficulties with words."  When questioned about the Miranda card, defendant stated he did not know what he was signing and did not read the card before signing it.  Defendant explained he neither understood his constitutional rights, nor that he was waiving his rights.  Likewise, defendant did not know he could ask for an interpreter, and spoke with the detectives in English, instead of Spanish, because he did not "think they [spoke] Spanish" and he wanted to "cooperate with them."

Defendant said he had never been arrested before.  He explained that when he was a witness in the federal case, they used an interpreter "[b]ecause[] when [he] was giving [his] statement . . . in English, there [were] a lot of mistakes[.]"  According to defendant, "[he] was confused" during the interview "because [the detectives] continue[d] asking [him] question[s,] one after another," and "ask[ed] [him] the same question without [him] having answered the previous question[.]"  He explained that when he admitted "licking" a girl's breasts and vagina, he was referring to the fifteen-year-old girl who had lived with them two years prior.  Further, defendant stated that on the date of the interview, he had just returned from Puerto Rico at 5:00 a.m. and went straight to work.  In addition, he had one OxyContin pill before he left Puerto Rico and another

8

before work, and the last time he had eaten was around 6:00 or 7:00 p.m. the previous night.

In an oral opinion, the motion judge granted defendant's motion to suppress his statement to police and the apology letter to Y.N. Initially, the judge acknowledged that the State had the burden "not only to demonstrate that . . . defendant was informed of his rights, but also that he knowingly, intelligently, and voluntarily waived those rights prior to making a statement." The judge continued that "[t]he State ha[d] the burden to prove, beyond a reasonable doubt, that the waiver was valid, and to determine whether the waiver was valid, the [c]ourt ha[d] to assess the totality of the circumstances." The judge posited that defendant "challenge[d] the statement on two grounds, one that [defendant] did not speak English well enough to understand the questions being asked of him, or to answer them in a way he intended to. And, two, that because of his language limitations[,] the Miranda rights were not properly administered."

From viewing the videotaped interview, the judge determined that while "English was not [defendant's] primary language[,]" he "ha[d] good English language skills[,]" and "seem[ed] to understand what [was] being asked of him." According to the judge, "[h]e was able to carry on a conversation, sometimes

semantics were not quite correct, but when he talked about Puerto Rico, his work, his family, anything of a general nature, he spoke freely and fluently." Nonetheless, the judge pointed out that defendant testified "he was educated in Puerto Rico," and "learned English on the streets." The judge also observed that while his apology letter to Y.N. was "in English" and was "comprehensible," the letter "d[id] not demonstrate a significant capacity for writing in the English language" and was comparable to a "junior high school level of writing."

Given defendant's language limitation, the judge was troubled by the manner in which Hemple administered the Miranda warnings to him. The judge explained:

> The Miranda warning card was in the hands of Detective Hemple, who, according to the video, was sitting maybe three feet . . . maybe a little more, from . . . defendant. And, Detective Hemple read the rights very quickly.
>
> [Defense counsel] calls it seconds. She probably is not far off the mark on that.
>
> [Defendant] . . . was then shown the back of the [Miranda] card where the signature line is, and signed it. In the vast majority of cases . . . , when Miranda warnings are read, certainly in a case as serious as this, one by one the officer reads the right and says, "Do you understand?" And, the defendant initials, indicating that he understood. That did not happen here.

If it had happened here, . . . defendant would have had the card in front of him, and underneath each right in English[,] the right written in Spanish appears.

So, . . . if Detective Hemple had had the card on . . . the table, in front of [defendant], and read to him, . . . . defendant would have been able to read along in Spanish as to what that right says.

. . . .

I note that . . . defendant was in Puerto Rico, came home at 5:00 a.m., [and] went directly to work. Officers arrived at [his] work, and according to Detective Efelis, said, "I[] [am] conducting an investigation, we[] [would] like you to answer some questions. Do you want to come with us?" And, . . . defendant went with them.

He was never told, at that point in time, that a sexual assault was being investigated. And, . . . [he] was never told that he was the target of the investigation.

He went with the officers to the police station, and shortly thereafter, was read the Miranda rights in a fashion that I just described. It is clear from the video that . . . defendant is being fully cooperative. It[] [is] also clear he has no clue what lies ahead, as the interrogation proceeds. And, that is often the case.

But, in those cases, individuals have read and understood their Miranda rights and have signed indicating that they did.

While the judge did not "think . . . defendant . . . needed an interpreter during [the] interview[,]" she believed "the officers could have done a much

11

better job of making sure that he did[] [not] need an interpreter" because defendant "clearly had a heavy accent" and "said he had just come back from Puerto Rico." The judge criticized the officers for not inquiring about defendant's understanding of and proficiency with the English language, and not "explor[ing] any of his educational background with him[.]" "[I]nstead, . . . Hemple read the[] rights very quickly, did [not] give . . . defendant an opportunity to read [it] in English or Spanish, and simply had him sign."

The judge also addressed defendant's contention "that it got confusing for him" during the interview, and found "some truth in that [contention]" because

> [t]he video show[ed] . . . that there [were] points where . . . defendant is formulating an answer, saying some words, and is asked another question with sometimes a suggestion as to what . . . defendant should be focusing on. Not what his answer should be, but what he should be thinking about.

Additionally, the judge considered the totality of the circumstances, acknowledging that "defendant [was] [thirty-five] years old, employed, [and] appear[ed] to be of at least average intelligence, if not more." Moreover, "this was not a lengthy interrogation[,]" lasting about "an hour or so," and defendant "appeared to be comfortable," and "did[] [not] request anything by way of food, beverage, a break, an attorney, nothing." Instead, "[h]e just went ahead and

12

answered their questions."  Further, "[t]he interview itself was conducted fairly well" by "trained" detectives.

Nonetheless, because the judge found that "the Miranda rights were not given the attention . . . they deserved[,]" she determined defendant was not afforded an opportunity "to understand those rights in a fashion that he deserved under our laws[.]"  According to the judge, "sometimes, there are instances where an officer is so anxious to get to the substance that they gloss over the Miranda rights."  The judge found that "that [was] what happened here." Therefore, the judge concluded that the State failed to establish beyond a reasonable doubt that defendant "knowingly, intelligently, or voluntarily waive[d] his Miranda rights."  The judge entered a memorializing order, suppressing defendant's statement and apology letter, and this appeal followed.

We begin our analysis with the governing principles.  "The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, [Rule] 503[9]."  State v. S.S., 229 N.J. 360, 381-82 (2017) (quoting Nyhammer, 197 N.J. at 399).  "The administration of Miranda warnings ensures that a defendant's right against self-incrimination is

---

9 N.J.R.E. 503.

protected in the inherently coercive atmosphere of custodial interrogation."

State v. A.M., 237 N.J. 384, 397 (2019).  Thus, "[t]he essential purpose of

Miranda is to empower a person—subject to custodial interrogation within a

police-dominated atmosphere—with knowledge of his basic constitutional

rights so that he can exercise, according to his free will, the right against self-

incrimination or waive that right and answer questions."  Nyhammer, 197 N.J.

at 406.  To that end, a person subject to custodial interrogation "must be

adequately and effectively apprised of his rights."  Id. at 400 (quoting Miranda,

384 U.S. at 467).

Our Court has recognized that "[t]he problem of communicating Miranda

rights to non-English-speaking defendants is important, particularly in a state

with so diverse a population."  State v. Mejia, 141 N.J. 475, 503 (1995)

(superseded by statutory amendment and overruled on separate grounds).

Miranda nonetheless requires "meaningful advice to the unlettered and

unlearned in language which he [or she] can comprehend and on which he [or

she] can knowingly act."  State v. Bode, 108 N.J. Super. 363, 367 (App. Div.

1970) (quoting Coyote v. United States, 380 F.2d 305, 308 (10th Cir. 1967)).

Thus, even if a law enforcement officer reads a defendant his or her Miranda

rights, the waiver of those rights is invalid if the defendant did not waive them

knowingly, intelligently, and voluntarily. Fare v. Michael C., 442 U.S. 707, 724 (1979).

Before any evidence acquired through a custodial interrogation can be used against a defendant, "[t]he burden is on the prosecution to demonstrate not only that the individual was informed of his rights, but also that he has knowingly, voluntarily, and intelligently waived those rights[.]" Nyhammer, 197 N.J. at 400-01. In turn, the trial court must determine whether the State has satisfied its heavy burden by proof "beyond a reasonable doubt that the suspect's waiver [of rights] was knowing, intelligent, and voluntary," State v. Yohnnson, 204 N.J. 43, 59 (2010) (alteration in original) (quoting State v. Presha, 163 N.J. 304, 313 (2000)), based upon an evaluation of the "totality of the circumstances[.]" Nyhammer, 197 N.J. at 405. A "totality-of-the-circumstances" analysis requires the court to consider such factors as a defendant's "age, education and intelligence, advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature[,] and whether physical punishment or mental exhaustion was involved." Id. at 402 (quoting Presha, 163 N.J. at 313).

"Generally, on appellate review, a trial court's factual findings in support of granting or denying a motion to suppress must be upheld when 'those findings

are supported by sufficient credible evidence in the record.'" S.S., 229 N.J. at 374 (quoting State v. Gamble, 218 N.J. 412, 424 (2014)). Moreover, "a trial court's factual findings should not be overturned merely because an appellate court disagrees with the inferences drawn and the evidence accepted by the trial court or because it would have reached a different conclusion." Ibid. Indeed, "[a]n appellate court should not disturb a trial court's factual findings unless those findings are 'so clearly mistaken that the interests of justice demand intervention and correction.'" Ibid. (quoting Gamble, 218 N.J. at 425).

In S.S., reversing the standard articulated in State v. Diaz-Bridges, 208 N.J. 544, 565-66 (2011), the Court extended the deferential standard of appellate review to the trial court's "factual findings based on a video recording or documentary evidence" in order to ensure that trial courts that "have ongoing experience and expertise in fulfilling the role of factfinder[,]" remain "'the finder of the facts,' in the absence of clear error." S.S., 229 N.J. at 380-81 (quoting Fed. R. Civ. P. 52(a) advisory committee's note to 1985 amendment). The S.S. Court, however, reaffirmed the principle that "[b]ecause legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo—with fresh eyes—owing no deference to the interpretive conclusions' of trial courts, 'unless persuaded by

their reasoning.'" Id. at 380 (quoting State v. Morrison, 227 N.J. 295, 308 (2016)).

Applying these principles here, we are satisfied that the judge's factual findings are supported by sufficient credible evidence in the record. We also agree with the judge's legal conclusion that the State failed to prove, beyond a reasonable doubt, that defendant made a knowing and informed decision to waive his Fifth Amendment right based on the manner in which the detectives administered the Miranda warnings and procured defendant's waiver. As the judge pointed out, the detectives failed to ask follow up questions about defendant's English proficiency despite clear indications that English was not his first language, failed to explore his educational background, rushed reading the rights to him, and did not give defendant an opportunity to read the Miranda card himself, in English or Spanish, before having him sign the waiver.

Recently, in A.M., the Court stated that in order

> [t]o eliminate questions about a suspect's understanding, the entire Miranda form should be read aloud to a suspect being interrogated, or the suspect should be asked to read the entire form aloud. Where that is not done, the suspect should be asked about his . . . literacy and educational background.
>
> [237 N.J. at 400.]

The judge found that did not occur here. Further, the A.M. Court stressed that "a knowing, intelligent, and voluntary waiver is determined by the totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court[,]" id. at 398, which "must be upheld when 'those findings are supported by sufficient credible evidence in the record.'" Id. at 395 (quoting S.S., 229 N.J. at 374). Here, we are satisfied that the judge's "fact-based assessments" are adequately "supported by sufficient credible evidence in the record."

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

18

A-3008-18T4